### BLUFORD LEE V. THE STATE.
*No. 591.    Decided May 27.*

1. **Assault—What Is.**—To constitute an assault, there must be the commencement of an act which, if not prevented, would produce a battery.

2. **Same—Construction of Statute.**—Under provisions of article 484, Penal Code, defining assault and battery, *Held*, there can be no assault without a present intention, as well as a present ability, of using some weapon against the person of another.

3. **Same—Evidence Insufficient.**—See facts reported, which are held to be wholly insufficient to support a conviction for aggravated assault with a gun.

APPEAL from the County Court of Taylor. Tried below before Hon. D. G. HILL, County Judge.

This appeal is from a conviction for aggravated assault, wherein the punishment was assessed at a fine of $25.

In compliance with the instructions of Presiding Judge Hurt, we give the testimony of the following witnesses, as embracing or proving all the essential facts on the trial:

Allen Middleton testified: "I am the Allen Middleton named in the complaint and information. About April 18, 1894, and on the day prior

to making the complaint in this cause, Bob Walls and I were together in my pasture.   We saw two parties on horseback coming towards us. In a little while I saw they were the defendant and his brother, Jim Lee.   They rode up to where we were.   Jim Lee came 'sorter' behind me, and Bluford Lee, the defendant, headed me off and stopped right in front of me, two or three feet.   Jim Lee said, 'Well, I see you got them red dogs, and we have come to get $50.'   Defendant then said, 'Hold on; we want to talk to you.'   I said, 'How do you know I poisoned your dog?   This is no way to do.   When you all killed my cow, I didn't come to you, but sent you word, and you paid for the cow.' Bluford Lee, the defendant, then remarked, 'God damn you, you know you poisoned our dog, and we are going to have $50 or kill you right here.'   When they rode up, defendant had a Winchester across his saddle in front of him.   He then had the gun cocked, raised up, with it inclined towards me, but the gun was not presented at me, more than that it was inclined in my direction.   At the time the last remark was made I started my horse as if to go around defendant, and he raised the Winchester and cocked it, saying, 'Hold up; we ain't through talking yet,' and I stopped.   I told him I had the pasture rented, and told them to stay out.   Defendant said I was a liar; that the land we were then on was not mine; that it belonged to Rushing, and that was the reason they had come there.   Defendant said, 'We will hunt in the pasture if we please.   I will blow a hole through you big enough to run a dog through.'   I told them they had violated the law.   Defendant said, 'Yes; if you repeat this we will get hair and blood, and if you see me carrying this Winchester, you may know I am carrying it for you.'   This all occurred in Taylor County, Texas.''

Cross-examined:   "There was nothing to have prevented defendant from striking or shooting me with the gun.   At the time he raised the gun the muzzle was not pointing towards me.   He raised it to an angle of about forty-five degrees.   Didn't throw it down towards me, or attempt to throw it on me or to strike me with it.   No one prevented him from striking me or from shooting me.   He could have done either if he had tried.   At the time the gun was raised we all four were on horseback.   Just before he raised the gun I started my horse for the purpose of going round the defendant, but in starting I went somewhat towards defendant.   I was then within three feet of him—in reaching distance, almost.   Just as I started was the time he said, 'Hold up,' etc., and raised and cocked the gun.   I then stopped, and defendant immediately lowered the gun across his saddle to the position it had formerly occupied.   Friday night I sent word to Mr. G. C. Baker to tie up his dog; that I was going to put out poison.   Baker lives over two miles from me.   Defendant lives between a half and three-fourths of a mile from me.   I did not send any word to defendant's people.   On the same Friday I told Walls to put out poison for wolves.   He put it out on the day following (Saturday preceding the difficulty).   The land referred to did not belong to me, nor did I have

it leased. It belonged to Rushing. At the time Rushing bought it, it was inclosed in my pasture, and I understood that Rushing did not object to it remaining inclosed by my fence. After the gun was raised and cocked, the defendant suggested that we arbitrate the poisoning of the dog to some of the neighbors. I refused, saying I would let the officers determine it, and he said that he would make complaint against me for killing the dog. Defendant made no other demonstration than the one referred to. Jim Lee did not have any gun."

Bob Walls testified, on direct examination, substantially as the witness Middleton, and also further, that the gun in question was an ordinary Winchester gun, four or five feet long, and that he knew whether it was a deadly weapon or not; and in the opinion of witness, it was a deadly weapon. And also, that when the gun was raised and cocked he rode up to Jim Lee, and said, "You boys are doing wrong to come in Middleton's place and do this way," and Jim Lee remarked, "That's all right. We know what we are doing. We came here on this land of Rushing's on purpose." "On Friday before the difficulty Middleton and I were at work on the fence, when the Lee boys came up and spoke to us. Middleton did not speak to them. He was perhaps 100 feet or more from us. The Lee boys asked if there was any poison in the Middleton pasture. I told them there was not, but I thought Middleton might put out some. The boys then remarked, that if there was no poison out, and Middleton did not object, they would hunt with their dogs in the pasture. I did not tell them not to do so. Don't know whether or not Middleton heard this talk. That evening he told me to put out the poison, and sent word to Baker to tie up his dog. No word was sent defendant. The next morning I put out the poison near the Lee boys' house. Sunday after the Saturday night at which I was at Chinault's house I saw defendant, and we had a fight. I whipped him. Afterwards, in telling some of the boys about whipping defendant, and in that connection, I stated that a brother of the prosecuting witness, Middleton, had promised me the finest saddle blanket in Dallas. After defendant and I had the fight I met Mat Chinault, and told him that the gun was cocked by Bluford Lee, and he remarked, that that description of the use made of the gun did not accord with the former description made by me. At the time the gun was raised and cocked the parties and myself were all on horseback. Just before the gun was raised and cocked Middleton said, 'You can shoot me, but you can't make me pay the fifty dollars,' and then started his horse forward. This caused the horse to go towards defendant. It was then the defendant raised and cocked the gun, and said, 'Hold up; we aint through talking yet.' Middleton then stopped, and defendant lowered the gun across his saddle. The gun was at no time pointed at Middleton. No effort was made to strike Middleton with it. He could have struck him with it, as he was only three or four feet from Middleton. No one prevented defendant from striking or shooting. He could have done both if he had wanted to do so. No demonstration was

made with the gun, except the instance above stated. After talking awhile longer, Middleton and I rode off, and defendant and brother rode off towards the gate."

Jess Baker testified: "The day of the alleged assault, defendant and Jim Lee came by my house and asked me to go over to Middleton's pasture with them, saying that Middleton had poisoned their dog and a dog of mine. Bluford Lee said, that if Middleton didn't pay for the dog he was going to whip him, but that he was not going to bother him on his premises. When they were there Bluford Lee had a Winchester in the scabbard. I afterwards saw the Lee boys, and Bluford said Middleton looked scared."

Jim Lee testified: "The morning of the alleged difficulty our red hound dog came from Middleton's pasture, showing that he had been poisoned. That afternoon defendant and I went to Middleton's for the purpose of seeing him about poisoning the dog, and getting him to pay for it. We had no intention of creating trouble, but in the event he refused to pay for the dog, we had no plan arranged to assault Middleton if he refused to pay for the dog, but we did understand that nothing was to be done in Middleton pasture, except to try and get him to pay for the dog. We had no intention of assaulting him in the pasture. Our intention, though, was, if he refused to pay for the dog, to whip him the first time we caught him outside of his pasture. We knew that Middleton did not like defendant, but had no idea he disliked me, and for that reason it was understood that defendant should not go to Middleton's house. I was to go to the house and talk to Middleton about a settlement for the dog. Defendant went down to look for the poison, and I went up to the house for the purpose of seeing Middleton and trying to get him to pay for our dog. Middleton was not at his house, and I went back and found defendant, and just then we saw Middleton and Walls. We went to where they were, and I said, 'Well, you poisoned them red dogs, and we want you to pay us $50.' Middleton said, 'Ugh! Hugh!' and that he had not poisoned the dogs. Defendant told him he was a liar; that he had caused poison to be put out for the dogs, and that he had to pay for the dog. We talked for some time, and tried to get Middleton to leave it to the neighbors to settle. He refused to do it. We asked him if he would pay $25, and he said he would not, unless the courts said he was liable; and then we told him we would take it to the courts, and rode off. I had no gun. I did not see defendant cock the gun or make any demonstration with it. If he had done so, I believe I would have seen it. He had no intention of assaulting Middleton. I am the Jim Lee tried and acquitted on this charge yesterday in this court."

No briefs for appellant.

*Mann Trice*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—This is a conviction for aggravated assault with a gun—a deadly weapon.

Do the facts show an assault? is the only question presented for discussion. The court submitted to the jury the following: "The use of any dangerous weapon or the semblance thereof, in an angry or threatening manner, with intent to alarm another, and under circumstances calculated to effect that object, comes within the meaning of an assault." · But, in connection with this provision of the statute, the court instructed the jury, that such an assault would be "simple assault." The jury convicted appellant of aggravated assault, thus evidently showing that their verdict was not based upon the statute last mentioned.

Do the facts—those which tend to support the verdict most strongly—constitute an assault as defined by Penal Code, article 484? They do not. What is an assault? "Any attempt to commit a battery." There was no attempt to commit a battery in this case. "Or any threatening gesture showing in itself, or by words accompanying it, an immediate intention to commit a battery." (The ability was there.) There was no gesture alone or accompanied by a word, showing an immediate intention to commit the battery here. There was no assault as defined by article 484, Penal Code. To constitute an assault there must be the commencement of an act which, if not prevented, would produce a battery. Lawson v. The State, 30 Ala., 14. There can be no assault (under this article 484) without a present intention, as well as present ability, of using some weapon against the person of another. The Reporter will give the evidence.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.